AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
2/3/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ASI _____ DEPUTY

# UNITED STATES DISTRICT COURT

**FILED**
CLERK, U.S. DISTRICT COURT
2/3/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No.   2:25-mj-00455-DUTY |
| MARCEL MUSAT, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 2, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of unauthorized access devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
*Complainant's signature*

LUIS PINEDA, Detective, Hermosa Beach Police Department
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      2/3/2025
_____
*Judge's signature*

City and state:   Los Angeles, California      Hon. Margo A. Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sophia Carrillo (x0546)

## <u>AFFIDAVIT</u>

I, LUIS PINEDA, being duly sworn, declare and state as follows:

## I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint against Marcel Petru MUSAT ("MUSAT") for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search a Blue Samsung cellphone (serial number R5CXC0SBVDFF) seized from MUSAT (the "SUBJECT DEVICE") and currently in the custody of Homeland Security Investigations ("HSI"), in Long Beach, CA, as described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 1344 (Bank Fraud)(collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Detective for the Hermosa Beach Police Department (HBPD), currently assigned as a Task Force Officer for Homeland Security Investigations (HSI), and have been a Peace Officer for approximately 3.5 years. I have been employed by the City of Hermosa Beach for approximately 9 years.

6.    I have previously been assigned as a Patrol Officer, from 2021 through 2024. Since June 2024, I have been assigned to the HBPD Detective Bureau investigating financial crimes, property crimes, and crimes against persons.

7.    During the course of my career, I have investigated crimes involving narcotics, auto theft, weapons, property crimes, crimes against persons, as well as forgery, fraud, and identity theft. I have assisted with search warrants for these crimes. These investigations and search warrants have led to the arrests and convictions of multiple suspects, as well as the recovery of illegal narcotics, weapons, stolen property, evidence related to identity theft, counterfeiting, fraud, and other evidence conducive and consistent with criminal behavior.

8.    I have worked in an undercover capacity resulting in the information and arrest of suspects for violations of specific California penal codes, California health and safety codes, and/or California business and professions codes. I have conducted interviews with numerous individuals who have been arrested and/or convicted of the above related crimes. Many of

those interviewed have provided me with intelligence, information, and education related to the above crimes. I have also conducted numerous hours of surveillance, following, observing, and studying the movements and behaviors of subjects involved in criminal activity

9.    I graduated from the Golden West College Police Academy. I have attended police department sponsored in-service training, attended multiple 30-hour Gang Conferences, 40-hour Academy Instructor Certification Course, 8-hour Sexual Assault training for First Responders, as well as received training instruction from senior officers and detectives on the elements of criminal investigations. I have also attended a POST online class on the writing and execution of search warrants.

### III.  SUMMARY OF PROBABLE CAUSE

10.   Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards. This fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

11.   On or about February 2, 2025, beginning at approximately 5:30 a.m., law enforcement began physical surveillance at U.S. Bank located at 21201 Hawthorne Blvd, Torrance, CA 90503 ("Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud. Law enforcement

officers were positioned nearby such that they could see individuals walking up to the Target Bank's ATMs and conduct transactions at the ATMs. In addition, law enforcement teams reviewed surveillance images provided by the Target Bank of the ATM transactions that morning.

12.  At approximately 6:00 a.m., I saw MUSAT arrive at an ATM terminal located at the Target Bank where law enforcement was conducting surveillance. MUSAT withdrew approximately $1,900 in cash from the ATM using 1 access device. I then detained MUSAT and found approximately 45 access devices (later determined to be cloned cards, 1 of which had the same EBT card information MUSAT used to withdraw $1,900 in cash from the ATM) on his person. MUSAT was arrested. MUSAT had in his possession approximately $1,900 in cash and the SUBJECT DEVICE.

### IV. STATEMENT OF PROBABLE CAUSE

13.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Regulatory Background of CalFresh and CalWORKs Programs**

14.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California. One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs. Another assistance program administered

4

by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

15. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com. Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

16. CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards"). EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

17. The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN"). A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

18. Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month. Those benefits are deposited directly from DSS into the account of the EBT cardholder.

19. The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal

identification number ("PIN") established by the card holder.
The EBT cardholder presents the card at an ATM, inserts the card
into the ATM card reader, and utilizes a PIN to withdraw the
funds previously deposited by DSS intended for beneficiaries of
the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

20.   Since in or about August 2022, local law enforcement
has been working with DSS to investigate a significant increase
in unauthorized cash withdrawals utilizing EBT cards. Based on
analysis of victim complaints to DSS, victim complaints to local
law enforcement, bank records, and surveillance, law enforcement
determined that the majority of the unauthorized cash
withdrawals were being conducted with cloned cards.

21.   A cloned card can be a blank white plastic card or
another debit, credit or gift card that contains altered
information on the card's magnetic stripe.  Based on my training
and experience, I know that suspects will often clone cards by
taking stolen card information from a victim card's magnetic
stripe and re-encode that stolen information onto another card's
magnetic stripe.  Cloning these cards allows the suspect to use
the card and the DSS benefits added on to the account linked to
the card for illicit purchases or unauthorized cash withdrawals.

22.   On a legitimate debit or credit card, the information
contained on the card's magnetic stripe will match the
information embossed on the front of the card. This information
includes the account number, expiration date, and cardholder's

name, among other information. Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card. For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

23.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

25.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim

account holder's account information that was obtained from
skimming. Once that information is loaded onto another
fraudulent card (e.g., a gift card or blank plastic card),
members of the scheme then use that fraudulent card to withdraw
cash from the victim accountholder's bank accounts or to make
purchases with the victim accountholder's account.

26.  In or about September 2022, local law enforcement
conducted a surveillance and arrest operation in the Los
Angeles, California area. This operation was planned in response
to the large number of unauthorized withdrawals occurring at
ATMs in the Los Angeles area during a short period of time.
Specifically, law enforcement had analyzed fraudulent EBT
withdrawal data and noticed a high volume of unauthorized
withdrawals on specific dates and times that coincided with the
dates when the majority of benefits are disbursed to EBT
cardholders.

27.  As a result of this operation, local law enforcement
established surveillance at select ATMs that were used to
conduct a significant volume of EBT fraud. Law enforcement
surveilled those ATMs around the dates when benefits had been
disbursed, observed suspects that withdrew a high volume of
unauthorized withdrawals and that conducted those withdrawals in
rapid succession, and arrested multiple individuals believed to
be making fraudulent withdrawals of EBT benefits. As a result,
law enforcement arrested approximately 16 suspects. All of the
arrested suspects were later determined to be citizens of
countries other than the United States who did not have

documentation to be lawfully present in the United States. All
of the individuals arrested were released from local custody
within hours of their arrest and absconded from any future
judicial proceedings.

28.  In or about February 2023, in response to a further
increase in unauthorized cash withdrawals utilizing EBT cards
after the local law enforcement September 2022 operation,
federal law enforcement conducted a similar surveillance and
arrest operation in the Los Angeles, California area. Law
enforcement established surveillance around the dates when
benefits had been disbursed at select high-volume EBT fraud
ATMs. Law enforcement arrested three suspects that withdrew a
high volume of unauthorized withdrawals and that conducted those
withdrawals in rapid succession.  Two of those defendants came
to the ATM together, possessed 35 cloned EBT cards at the time
of arrest, and later analysis of historic ATM surveillance data
showed that they had made more than $190,000 in past attempted
fraudulent EBT withdrawals from a single bank since October
2022.  One additional defendant possessed 269 cloned EBT cards
at the time of arrest, and later analysis of historic ATM
surveillance data showed that the defendant had made more than
$70,000 in past attempted fraudulent EBT withdrawals from a
single bank since January 2023.  All three of these defendants
were determined to be citizens of Romania, who did not have
documentation to be lawfully present in the United States.  The
three arrested defendants were ordered detained pending trial by
the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal

grand jury returned two indictments against the three defendants
for bank fraud, in violation of 18 U.S.C. § 1344; aggravated
identity theft, in violation of 18 U.S.C. § 1028A; use of
unauthorized access devices, in violation 18 U.S.C.
§ 1029(a)(2); and possession of unauthorized access devices, in
violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-
CR-0077-JFW.

29.    In or about March 2023, federal law enforcement
conducted another surveillance and arrest operation in the Los
Angeles, California area. Law enforcement established
surveillance around the dates when benefits had been disbursed
at select high-volume EBT fraud ATMs. Law enforcement arrested
eleven suspects that conducted a high volume of unauthorized
transactions and that conducted those transactions in rapid
succession. At the time of their arrest, the suspects had in
their possession over 400 cloned cards, $120,000 in illicitly
obtained funds, and multiple skimming devices.

30.    Ten out of the eleven of these defendants were
determined to be citizens of Romania, who did not have
documentation to be lawfully present in the United States.

**C.    Background of Current Operation to Combat EBT Fraud**

31.    The most current data provided by DSS, based in part
upon reported fraud by victims, indicates that between January
2024 and January 1, 2025, more than approximately $126.8 million
in cash benefits has been stolen from victim EBT cards
throughout California.

32.  Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT cards, in the county of Los Angeles alone. The majority of these funds were stolen through unauthorized ATM withdrawals.

33.  Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

34.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices. Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits. Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

35.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

36.  Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**D.    MUSAT Committed EBT Fraud Using Unauthorized Access Devices on February 2, 2025**

37.  Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement decided to conduct a surveillance and arrest operation in February 2025.

38.  Based upon my training and experience, I know that as an anti-fraud measure, Cal DSS places an embargo on EBT

accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards until approximately 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account).

39.  On or about February 2, 2025, beginning at approximately 5:30 a.m., I began surveillance on the Target Bank.

40.  At approximately 6:00 a.m., I observed MUSAT enter the Target Bank parking lot and ride his bicycle to a drive-thru ATM terminal.

41.  At approximately 6:01 a.m., based on my review of surveillance footage, MUSAT used 2 different access cards (accounts ending in -6519 and -6809, respectively) for balance inquires.

42.  At approximately 6:02 a.m., MUSAT used a third access card (account ending in -9740) for a balance inquiry. MUSAT then used the same access card (account ending in -9740) to withdrawal approximately $1,900.

43.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

44.  Based on the date, time, ATM location, presence of multiple, and successive ATM transactions on multiple EBT cardholder accounts during a short time period, I detained MUSAT in order to investigate further.

45.  Incident to arrest, I searched MUSAT and discovered MUSAT had approximately 45 cloned cards on his person (left hand and jacket pockets). The cloned cards consisted of Vanilla Visa gift cards, Secure Spend gift cards, white plastic cards with magnetic stripe, and yellow plastic cards with magnetic stripe. The cards also had stickers placed on them with, what appeared to be, based on my training and experience, card balances and victim PINs.

46.  A team of United States Secret Service (USSS) Special Agents, HSI Analysts, and USSS Analysts analyzed the magnetic stripe of the cloned cards and determined all of them were encoded with mismatching card numbers. 45 of the cards MUSAT possessed at the time of arrest were encoded with EBT BINs. Moreover, the cloned cards also were affixed with stickers bearing victim PIN numbers and balances that closely corresponded to each cloned card and withdrawal amount and were needed in order to conduct the unauthorized ATM withdrawals.

47.  Based on my review of ATM surveillance stills and logs from Target Bank, I observed MUSAT perform four transactions involving EBT card numbers -- all of which matched EBT card numbers encoded on the cloned card seized from MUSAT incident to his arrest. One of those transactions was a successful withdrawal totaling $1,900 in financial loss. MUSAT had approximately $1,900 in cash in his pockets, which was the exact in value to the approximately $1,900 in total unauthorized ATM withdrawals. Target Bank ATM surveillance photographs also clearly depicted MUSAT at the ATM conducting the unauthorized

14

withdrawals using cloned EBT cards and directly corroborated law enforcement's surveillance observations.

48.  Based on my review of EBT cardholder information obtained from DSS, none of the EBT cards transacted by MUSAT belonged to him.

49.  While MUSAT was at the Target Bank ATM, law enforcement learned from U.S. Bank that MUSAT made approximately two balance inquiries belonging to two separate EBT accounts (accounts ending in -6519 and -6809, respectively). MUSAT then made a withdrawal transaction on an EBT account ending in -9740 belonging to an individual named A.C.  Law enforcement similarly confirmed with California's Department of Motor Vehicles ("DMV") that the individual conducting the ATM withdrawal did not appear to match A.C.

50.  On February 2, 2025, A.C. reported their EBT card ending in -9740 stolen to DSS, the same card MUSAT used to withdraw $1,900 and the same card which was in his possession at the time of arrest.

51.  During processing, and after I read MUSAT his Miranda Rights, MUSAT admitted to me of being a citizen and national of Romania. MUSAT further admitted to overstaying his visa.

52.  I queried MUSAT in U.S. Immigration and Customs Enforcement databases and learned MUSAT had no lawful status, and had previously been arrested by the Solano County CA Special Investigations Bureau (SIB) for 3 felonies and 2 misdemeanors for fraud / theft of EBT funds, using cloned EBT cards. As a result of a search warrant, SIB recovered cash 3 to 4 times the

15

amount stolen in Solano County, and also uncovered a small skimming device laboratory within the residence.

53.   The SUBJECT DEVICE was retrieved from MUSAT's bicycle. MUSAT had the DEVICE clipped on to the bicycle. The SUBJECT DEVICE was placed into a faraday bag to secure the device pending issuance of a search warrant.

54.   After being advised of his Miranda rights, MUSAT chose to speak with me and, in sum and substance, stated he had been dropped off, but refused to provide the identity of the person who dropped him off or any additional information.

V.   **TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

55.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.   It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card

accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such

schemes can also often be found on digital devices, such as computers.

e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.    Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICE as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

59.  For all of the reasons described above, there is probable cause to believe that MUSAT committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
February, 2025.

_____
THE HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE